**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PeaceHealth,

Plaintiff,

v.

Claritev Corp. f/k/a MultiPlan, Inc.; Aetna, Inc., a subsidiary of CVS Health Corporation; Blue Cross Blue Shield of Michigan Mutual Insurance Company; Aware Integrated, Inc.; BCBSM, Inc. d/b/a Blue Cross Blue Shield Of Minnesota; The Cigna Group; Elevance Health, Inc. f/k/a Anthem, Inc.; Health Care Service Corporation; Highmark Health; Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey; Kaiser Foundation Health Plan, Inc.; CareFirst Of Maryland; Blue Cross Blue Shield of Massachusetts; WebTPA Employer Services, LLC; Allied Benefit Systems, LLC; Christian Care Ministry, Inc., d/b/a Medi-Share; Imagine 360 Administrators, LLC,

Defendants.

Case No. 1:26-cv-09307

MDL No. 3121

**COMPLAINT**

**JURY TRIAL DEMANDED**

**PEACEHEALTH'S DIRECT ACTION PLAINTIFF SHORT-FORM COMPLAINT**

The Plaintiff named below files this Short-Form Complaint and (if checked off below) Demand for Jury Trial against the Defendant(s) named below by and through the undersigned counsel. Plaintiff incorporates by reference the factual allegations, as well as the claims and relief checked off below, sought in the Consolidated Master Direct Action Plaintiff Complaint ("Consolidated Master DAP Complaint") as it relates to the named Defendant(s) (checked-off below), filed in *In re Multiplan Health Insurance Provider Litigation*, MDL No. 3121, in the United States District Court for the Northern District of Illinois. Plaintiff files this Short-Form

Complaint pursuant to Case Management Order No. 6, filed on the MDL Docket (No. 1:24-cv-06795) at ECF 179.

Plaintiff indicates by checking the relevant boxes below the Parties, Designated Forum, Jurisdiction and Venue, Causes of Actions and other Relevant Information specific to Plaintiff's case. Plaintiff, by and through the undersigned counsel, alleges as follows:

## I. IDENTIFICATION OF PARTIES

1. **PLAINTIFF**

2. Name of the Plaintiff alleging claims against Defendant(s): **PeaceHealth**

3. For each Plaintiff that is a corporation, list the state of incorporation and state of principal place of business. For each Plaintiff that is an LLC or partnership, list the state citizenship of each of its members. For each Plaintiff that is a natural person, list the state of residency and citizenship at the time of the filing of this Short-Form Complaint [Indicate State[s]]: **Washington**

4. **DEFENDANT(S)**

5. Plaintiff names the following Defendant(s)[1] in this action [*Check all that apply*]:

| | |
|---|---|
| X | Claritev Corp. f/k/a MultiPlan, Inc. |
| X | Aetna, Inc., a subsidiary of CVS Health Corporation |
| | Blue Shield of California Life & Health Insurance Company |
| X | Blue Cross Blue Shield of Michigan Mutual Insurance Company |
| X | Aware Integrated, Inc. and BCBSM, Inc. d/b/a Blue Cross Blue Shield Of Minnesota |
| | Cambia Health Solutions, Inc. f/k/a The Regence Group |

[1] Each Defendant named in this Short-Form Complaint acted directly or through each of that entity's executives, employees, directors, and majority-owned subsidiaries. For example, UnitedHealth Group Inc. acted directly or through, among others, the following majority-owned subsidiaries: United Healthcare Insurance Company, and its affiliates; United Healthcare Services Inc.; United Healthcare Service LLC; Oxford Benefit Management, Inc.; UMR, Inc.; Sierra Health and Life Insurance Company, Inc.; Sierra Health-Care Options, Inc.; Health Plan of Nevada, Inc.; and United Healthcare of Florida, Inc.

| | |
|---|---|
| | Centene Corporation |
| X | The Cigna Group |
| X | Elevance Health, Inc. f/k/a Anthem, Inc. |
| X | Health Care Service Corporation |
| X | Highmark Health |
| X | Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey |
| | Humana Inc. |
| X | Kaiser Foundation Health Plan, Inc. |
| | Molina Healthcare, Inc. |
| | UnitedHealth Group Inc. |
| | Allied National, LLC |
| | Benefit Plans Administrators of Eau Claire, LLC |
| | Central States Southeast and Southwest Areas Health and Welfare Fund |
| | Consociate, Inc. d/b/a Consociate Health |
| | Healthcare Highways Health Plan (ASO), LLC |
| | Secure Health Plans Of Georgia, LLC d/b/a Secure Health |
| | Sanford Health Plan |
| X | CareFirst Of Maryland |
| X | Blue Cross Blue Shield of Massachusetts |

**6. OTHER DEFENDANTS**

7. For each "Other Defendant" Plaintiff contends are additional parties and are liable or responsible for Plaintiff's damages alleged herein, Plaintiff must identify by name each Defendant and its citizenship, and Plaintiff must plead the specific facts supporting any claim against each "Other Defendant" in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff may attach additional pages to this Short-Form Complaint.

| | NAME | CITIZENSHIP |
|---|---|---|
| 1 | WebTPA Employer Services, LLC | Texas |
| 2 | Allied Benefit Systems, LLC | Illinois |
| 3 | Christian Care Ministry, Inc., d/b/a Medi-Share | Florida |
| 4 | Group & Pension Administrators, Inc. n/k/a Imagine 360 Administrators, LLC | Incorporated: Delaware<br>PPOB: Pennsylvania |

## II. DESIGNATED FORUM

8. For Direct Filed Cases: Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: **Northern District of Illinois**

9. For Transferred Cases: Identify the Federal District Court in which the Plaintiff originally filed and the date of filing: **Not Applicable**

## III. JURISDICTION AND VENUE

10. Subject Matter Jurisdiction is based on:

☐ Diversity of Citizenship
☒ Federal Question
☐ Other (The basis of any additional grounds for jurisdiction must be pled in sufficient detail as required by the applicable Federal Rules of Civil Procedure):

________________________________________

________________________________________

## IV. FACTS AND INJURIES ASSERTED

11. Plaintiff adopts all paragraphs of the Consolidated Master DAP Complaint by reference, except for the allegations set forth in any cause of action that Plaintiff does not adopt (as indicated below). **PeaceHealth adopts all allegations in the Consolidated Master DAP Complaint.**

12. Plaintiff adopts and alleges as injuries resulting from the challenged conduct the injuries to DAPs set forth in the Consolidated Master DAP Complaint.

## V. ADDITIONAL FACTS DEMONSTRATING STANDING TO BRING CAUSES OF ACTION

13. Plaintiff alleges the following additional facts in support of its standing to bring causes of action:

**See attached additional pleadings.**

## VI. CAUSES OF ACTION ASSERTED

14. Plaintiff adopts and asserts the following Causes of Action alleged in the Consolidated Master DAP Complaint, and the allegations with regard thereto, against the Defendants identified above (*check all that are adopted*).

| Check all that apply | Count | Cause of Action | Law pursuant to which the cause of action is asserted in the Master Complaint |
|---|---|---|---|
| ☐ | I | Horizontal Agreements in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | II | Hub-And-Spoke Agreement in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | III | Principal-Agent Combinations in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | IV | Agreements to Unreasonably Restrain Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | V | Anticompetitive Information Exchange (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☐ | VI | Violation of State and D.C. Antitrust Statutes | |
| ☐ | VII | Violation of State Consumer Protection Laws | |
| ☐ | VII | Unjust Enrichment | |

**NOTE**

If Plaintiff wants to allege additional Causes of Action other than those selected in the preceding paragraph, which are the Causes of Action set forth in the Master Complaint, the facts supporting those additional Causes of Action, must be pled in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff may attach additional pages to this Short-Form Complaint.

## VII. ADDITIONAL CAUSES OF ACTION

15. Plaintiff asserts the following additional Causes of Action and supporting allegations against the following Defendants:

**None.** ______________________________________________

## VIII. PRAYER FOR RELIEF

16. *Check all that apply*:

[X] **WHEREFORE,** Plaintiff prays for all available compensatory damages, treble damages, punitive damages in amounts to be proven at trial, and judgment against Defendant(s) and all such further relief that this Court deems equitable and just as set forth in the Master Complaint, and any additional relief to which Plaintiff may be entitled, including disgorgement.

[X] **WHEREFORE,** Plaintiff prays for declaratory and injunctive relief and judgment against Defendant(s) and all such further relief that this Court deems equitable and just as set forth in the Master Complaint, and any additional relief to which Plaintiff may be entitled.

## JURY DEMAND

[*Check the applicable box*]:

[X] Plaintiff hereby demands a trial by jury as to all claims in this action.

[ ] Plaintiff **does not demand** a trial by jury as to all claims in this action.

****

By signature below, Plaintiff's counsel hereby confirms their submission to the authority and jurisdiction of the United States District Court of the Northern District of Illinois and oversight of counsel's duties under Federal Rule of Civil Procedure 11, including enforcement as necessary through sanctions and/or revocation of *pro hac vice* status.

Dated: August 4, 2026

*/s/ Stephen M. Medlock*

Stephen M. Medlock
Stephen Cohen (*pro hac vice* forthcoming)
Rami Abdallah E. Rashmawi (*pro hac vice* forthcoming)
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20037
Tel: (202) 639-6500
Fax: (202) 639-6604
smedlock@velaw.com
scohen@velaw.com
rrashmawi@velaw.com

Michael Scarborough (*pro hac vice* forthcoming)
Dylan Ballard (*pro hac vice* forthcoming)
Madison Lo (*pro hac vice* forthcoming)
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6900
Fax: (415) 651-8786
mscarborough@velaw.com
dballard@velaw.com
mlo@velaw.com

Mackenzie Newman (*pro hac vice* forthcoming)
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000
Fax: (212) 237-0100
jmcgovern@velaw.com
mnewman@velaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on August 4, 2026, he electronically filed a copy of the attached via the CM/ECF filing system, which sent notification of such filing to all Filing Users.

*/s/ Stephen M. Medlock*
Stephen M. Medlock

**ADDITIONAL FACTUAL ALLEGATIONS**

1. Plaintiff PeaceHealth is a Washington not-for-profit corporation with its principal place of business in Vancouver, Washington. Founded in 1890 by the Sisters of St. Joseph of Peace, PeaceHealth becomes a healthcare system that owns and operates numerous hospitals and healthcare clinics throughout the Western United States, including in Alaska, Oregon, and Washington.

2. PeaceHealth has approximately 16,000 caregivers and nearly 3,200 physicians and clinicians, more than 160 multi-specialty clinics and 9 medical centers serving both urban and rural communities throughout the Northwest. The nine medical centers include:

a. PeaceHealth St. Joseph Medical Center, a Level II Trauma Center and a Sole Community Hospital designated by the Centers for Medicare & Medicaid Services ("CMS"), serving the Whatcom County of the State of Washington. The center was the first hospital founded by the Sisters of St. Joseph of Peace in 1891. The center has 255 licensed beds and provides medical services including cancer treatment, cardiac care, joint replacement, spine care, care for family emergency and trauma, inpatient behavioral health treatment, childbirth, robotic surgery, and wellness therapy;

b. PeaceHealth United General Medical Center, a Level IV Trauma Center and a Critical Access Hospital designated by the CMS, serving the Skagit and Whatcom counties of the State of Washington. The center has 25 licensed beds and provides medical services such as breast care, cardiac care, cancer treatment, diagnostic imaging, gastroenterology, nutrition services, rehabilitation, pulmonology, orthopedics, urology, and neurology;

c. PeaceHealth Peace Island Medical Center, a Critical Access Hospital, serving the San Juan County of the State of Washington. The center has 10 licensed beds and

provides medical services such as cancer treatment, infusion, family medicine, internal medicine, orthopedics, emergency care, imaging services, laboratory, outpatient surgery, and behavioral health via telemedicine;

d. PeaceHealth Ketchikan Medical Center, a Critical Access Hospital, serving the Ketchikan County of the State of Alaska. The center has 25 licensed beds and provides medical services including behavioral health, diagnostic imaging, emergency medicine, general surgery, gastroenterologist services, home healthcare services, infusion therapies, laboratory, childbirth, long-term care, orthopedic surgery, pathology services, rehabilitation, respiratory therapy, sleep care, and urology;

e. PeaceHealth St. John Medical Center, a Level III Trauma Center and a Sole Community Hospital designated by the CMS, serving the Cowlitz County of the State of Washington. The center has 346 licensed beds and provides medical services including advanced heart and vascular care, breast care, advanced 3-D imaging services, childbirth, outpatient surgery, joint replacement, cancer care, behavioral healthcare for adults and children, women's health services, and sleep disorder treatment;

f. PeaceHealth Southwest Medical Center, a Level II Trauma Center, serving the Clark County of the State of Washington. The center was founded in 1858 by Sister Joseph of the Sacred Heart and is the first hospital in the Pacific Northwest. The center has 450 licensed beds and provides medical services including advanced heart and vascular care, childbirth for high-risk pregnancies, outpatient surgery, treatment for brain, spine and other tumors, stroke treatment, breast center treatment, advanced 3-D imaging services, joint replacement, and other cancer treatment;

g. PeaceHealth Sacred Heart Medical Center at RiverBend, a Level II Trauma Center, serving the Lane County of the State of Oregon. The center has 384 licensed beds and provides medical services including bariatric care, cancer treatment, childbirth, heart and vascular care, hyperbaric care, neuro-endovascular care, pediatric care, stroke treatment, robotic surgery, sleep care, and wound care;

h. PeaceHealth Cottage Grove Community Medical Center, a Critical Access Hospital, serving the Lane County of the State of Oregon. The center has 14 licensed beds and provides medical services including imaging services, laboratory services, wound and footcare, physical therapy, rehabilitation and wellness, family medicine, internal medicine, pediatrics, and emergency care;

i. PeaceHealth Peace Harbor Medical Center, a Level IV Trauma Center and a Critical Access Hospital, serving the Lane County of the State of Oregon. The center has 21 licensed beds and provides medical services including general medicine, women's health, maternity care, emergency services, general surgery, orthopedics, mental health, rehabilitation, and diabetes care.

3. PeaceHealth routinely provides services to commercially insured patients on an out-of-network ("OON") basis and submits bills for those services to the third-party payors. The payors that paid the substantial majority of PeaceHealth's OON claims used MultiPlan's OON Repricing Services.

4. PeaceHealth has been harmed by the MultiPlan Cartel suppressing the allowed amounts for OON services purchased by third-party payors. In 2024 alone, PeaceHealth submitted $62,364,940 in billed charges for OON care. Third-party payors allowed only $30,155,179 for those OON services, severely reducing the revenue that PeaceHealth received in exchange for

providing those OON services. These losses were caused, in part, by the MultiPlan Cartel. For example, performance reports created by MultiPlan show that members of the MultiPlan Cartel used MultiPlan’s common pricing methodology to underpay PeaceHealth for OON services.

5. PeaceHealth’s damages — measured by the difference between the lawful, but-for OON reimbursement that PeaceHealth would have received absent the MultiPlan Cartel and the artificially suppressed amounts that PeaceHealth actually received — are at least in the tens of millions of dollars, with the precise amount to be established at trial. These damages are a direct, foreseeable, and intended consequence of the cartel conduct alleged in the Master Complaint.

6. The systematic underpayment of PeaceHealth's hospitals through MultiPlan’s common pricing methodology causes cascading harm. Underpaid providers are forced to absorb the cartel-imposed shortfall and to curtail or eliminate medically necessary levels of care, or to exit entirely. The result is fewer beds, longer waitlists, narrower access, and ultimately more deaths. PeaceHealth’s injury, accordingly, is not merely an injury to itself. It is a direct and proximate consequence of an anticompetitive scheme that undermines the supply of medically necessary care to patients.

7. Upon information and belief, each of the defendants named in this short-form complaint, including WebTPA, Allied Benefit Systems, Medi-Share, and Imagine 360, have each executed an OON pricing agreement with MultiPlan (“Co-Conspirators”), abdicating OON pricing authority to MultiPlan, and have performed other acts and made other statements in furtherance of the conspiracy.

8. ***WebTPA.*** WebTPA Employer Services, LLC (“WebTPA”) is a Texas limited liability company with its principal place of business in Texas. WebTPA is a wholly owned subsidiary of GuideWell Mutual Holding Corporation, a mutual insurance holding company

incorporated and having its principal place of business in Florida. As a third-party administrator ("TPA"), WebTPA performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

9. WebTPA has executed OON pricing agreements with MultiPlan, abdicating OON pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. WebTPA has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. WebTPA became a client of MultiPlan no later than September 2015. According to the monthly performance reports made by MultiPlan, in 2022, WebTPA realized millions of dollars in "savings" from its underpayments to OON medical providers as a result of the MultiPlan Cartel in that year alone.

10. ***Allied Benefit Systems.*** Allied Benefit Systems, LLC. ("Allied Benefit Systems") is an Illinois limited liability company with its principal place of business in Illinois. Allied Benefit Systems is the largest independent TPA in the United States. As a TPA, Allied Benefit Systems performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

11. Allied Benefit Systems has executed OON pricing agreements with MultiPlan, abdicating OON pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. Allied Benefit Systems has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. Allied Benefit Systems became a client of MultiPlan no later than September 2015. According to a monthly performance report made by MultiPlan, in 2022, Allied Benefit Systems realized tens of millions of dollars in "savings" from its underpayments to OON medical providers as a result of the MultiPlan Cartel in that year alone.

12. ***Medi-Share.*** Christian Care Ministry, Inc., d/b/a Medi-Share ("Medi-Share"), is a not-for-profit corporation organized under the laws of Florida with its principal place of business in Florida. As a TPA, Medi-Share performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

13. Medi-Share has executed OON pricing agreements with MultiPlan, abdicating OON pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. Medi-Share has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. Medi-Share became a client of MultiPlan no later than August 2020. According to the monthly performance reports made by MultiPlan, in 2022, Medi-Share realized hundreds of millions of dollars in "savings" from its underpayments to OON medical providers as a result of the MultiPlan Cartel in that year alone.

14. ***Imagine 360.*** Group & Pension Administrators, Inc. n/k/a Imagine 360 Administrators, LLC ("Imagine 360") is a Delaware limited liability company with its principal place of business in Pennsylvania. As a TPA, Imagine 360 performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

15. Imagine 360 has executed out-of-network pricing agreements with MultiPlan, abdicating out-of-network pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy. Imagine 360 has subscribed to MultiPlan's negotiation service, Data iSight service, and Surprise Bill service. Imagine 360 became a client of MultiPlan no later than September 2015. Upon information and belief, Imagine 360 remains a client of MultiPlan to this day.

16. ***MultiPlan Client Advisory Board Meetings.*** The conspiracy was successfully

implemented through the annual gatherings of the executives of MultiPlan and Co-Conspirators.

17. For example, WebTPA sent several of its executives to attend the 2015, 2016, 2018, and 2019 MultiPlan Client Advisory Board Meetings. The executives ever attending these meetings include Lisa Tranberg, the current President of WebTPA; Nicole Moore, the director of WebTPA; Dwight Mankin; the former President of WebTPA, and Joseph Pascullo, the former Chief Business Services Officer of WebTPA.

18. As another example, Patrick Gabrione, the former Chief Operating Officer of Allied Benefit Systems, attended the 2015, 2016, 2017, 2018, 2019, 2021, and 2022 MultiPlan Client Advisory Board Meetings. After Mr. Gabrione's retirement in early 2023, Martin Laskowski, the Senior Vice President of Commercial Solutions at Allied Benefit Systems, attended the 2023 MultiPlan Client Advisory Board Meeting. The attendance history indicates that Allied Benefit Systems has long been a member of the MultiPlan Cartel.

19. Likewise, Jeff McPeters, the President of Group & Pension Administrators, Inc., attended the 2015, 2016, 2017, and 2018 MultiPlan Client Advisory Board Meetings. Following its merger and the formation of its successor, Imagine 360, on January 18, 2022, Jeff Bak, the President and CEO of Imagine 360, attended the 2022 and 2023 MultiPlan Client Advisory Board Meetings. The attendance history indicates that Imagine 360 has long been a member of the MultiPlan Cartel.

20. The Client Advisory Board Meetings were a meeting of the "rim" of MultiPlan's hub-and-spoke conspiracy. For example, the 2019 meeting included 132 attendees from 78 companies, including representatives of MultiPlan, Cigna, Blue Cross Blue Shield of Minnesota, Kaiser, HCSC, Humana, Elevance, Secure Health, United Health, Sanford, Blue Cross Blue Shield of Michigan, Molina, BPA, Consociate, Centene's subsidiary Health Net, and Highmark, among

others.

21. The Client Advisory Board Meetings included both business sessions with presentations from MultiPlan executives and social functions, such as cocktail hours, golf, and guided hikes.

22. No antitrust guidance concerning competitor communications was provided to attendees at the Client Advisory Board Meetings and no antitrust attorneys monitored the proceedings to make sure that discussions did not include legally improper topics or competitive sensitive information.

23. During Client Advisory Board meetings, MultiPlan's executives described *collective* changes that MultiPlan was making to the pricing methodology that Defendants used and how much money Defendants would make *collectively* through these tweaks to MultiPlan's collective pricing methodology. For example, in a 2015 speech to the MultiPlan Client Advisory Board Meeting, Michael Ferrante, the former Executive Vice President and Chief of Operation for MultiPlan, explained changes that MultiPlan had made to its Data iSight and negotiation services rules that resulted in payors collectively paying providers tens of millions of dollars less for OON services. Mr. Ferrante also described real-time and forward-looking changes that MultiPlan would be making to its collective pricing rules for OON services and the projected underpayments that those changes to pricing rules would cause.

24. Thus, every Defendant that attends the Client Advisory Board Meetings has signed contracts to utilize MultiPlan's common pricing methodology for OON claims. They have agreed to send providers' OON bills to MultiPlan to set the prices paid for those claims. They all met in the same room at the same time and discussed the pricing methodology they would use to purchase OON services. And they all implemented those pricing methodologies after those meetings.

25. During these Client Advisory Board Meetings, MultiPlan made it clear that by using MultiPlan's common pricing methodology the payors could obtain pricing results that they could not otherwise achieve by acting unilaterally due to provider or member abrasion. At these meetings, MultiPlan repeatedly emphasized that its pricing methodology could minimize abrasion while still lowering the prices paid to purchase OON services.

26. In a market free from collusion, abrasion would be a significant check on providers attempting to purchase OON services at sub-competitive prices. For elective services, providers would consider, threaten, or actually cease providing OON services for patients associated with payors that routinely low-balled them on OON compensation. That provider abrasion would undermine a central tenant of modern PPO plans—patients can see any doctor regardless of whether they are in-network and receive some health insurance coverage for those services. Indeed, in an October 14, 2024 post, MultiPlan identified abrasion as one of the "Top 5" challenges payors face. However, MultiPlan assured payors that if they used MultiPlan, MultiPlan would "minimize provider abrasion."

27. The way that MultiPlan minimizes abrasion is simple. If nearly all payors in the relevant market adopt MultiPlan's common pricing methodology, there is no opportunity for abrasion. The provider has no practical choice but to accept the prices set by the MultiPlan Cartel. Thus, it is little wonder that MultiPlan touts its Data iSight algorithm as lowering payments for OON services "with low provider abrasion."

28. WebTPA, Allied Benefit Systems, Medi-Share, and Imagine 360 each used MultiPlan's Data iSight algorithm to underpay healthcare providers for OON services. Records kept by MultiPlan show that the four payors have underpaid providers millions of dollars using MultiPlan's Data iSight algorithm.

29. MultiPlan's common pricing methodology is big business. Between 2021 and 2025 alone, MultiPlan's Data iSight algorithm caused providers to underpay providers by over $26 billion when measured against providers' billed charges. While MultiPlan and other members of the cartel have long claimed that the appropriate measure of prices for OON services is the Fair Health database or usual, customary, and reasonable charges ("UCR"), internal records demonstrate that MultiPlan and other members of the MultiPlan Cartel measure the effectiveness of MultiPlan's pricing methodology against providers' billed charges and then allocate payments to MultiPlan (through a percentage of savings payment) and the health plan (through a shared savings charge to an employer-sponsored health plan) using the difference between providers' billed charges and the price set by MultiPlan's pricing methodology.

30. PeaceHealth is asserting causes of action only as to purely non-contract charges submitted to members of the MultiPlan Cartel that were repriced pursuant to the cartel agreement described in the Consolidated Master DAP Complaint. There is no mandatory arbitration clause applicable to PeaceHealth's claims against any Defendant named in this Complaint.

31. ***Grand Jury Investigation***. From August 2024 to June 2026, the Antitrust Division of the U.S. Department of Justice ("DOJ") conducted a criminal investigation into MultiPlan and several payor members of the MultiPlan Cartel. On May 19, 2026, the DOJ opened a civil investigation into MultiPlan and several payors and issued multiple civil investigative demands. On June 17, 2026, the DOJ informed MultiPlan that it was closing the criminal investigation. The civil investigation remains ongoing. Public reporting suggests that the DOJ investigations focus on whether MultiPlan's Data iSight pricing methodology violates Section 1 of the Sherman Act.

32. ***State Attorney General Enforcement Actions.*** On June 1, 2026, the State of Arizona filed a civil enforcement action in Arizona state court against MultiPlan, Aetna, Cigna,

United, Elevance, HCSC, and other payors alleging that they conspired for years to fix the prices paid for out-of-network medical care in violation of Arizona's antitrust and consumer-fraud statutes. Announcing the action, Attorney General Mayes told reporters that the MultiPlan Cartel "wasn't an accident" but rather "a coordinated deliberate scheme," and that "the more they squeezed our doctors and hospitals, the more profits they made." She explained that the MultiPlan Cartel "is an example of old fashioned price fixing using new technology which is against the law all the same."